**FILED**

Dec 29 2017, 10:49 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

David W. Westland
Westland & Bennett, P.C.
Hammond, Indiana

ATTORNEY FOR APPELLEE

Joseph G. Bombagetti
Kelly Law Offices
Crown Point, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Buddy & Pal's III, Inc.,

*Appellant-Defendant,*

v.

Stephen Shearer,

*Appellee-Plaintiff.*

December 29, 2017

Court of Appeals Case No.
45A03-1703-CT-465

Appeal from the Lake Superior
Court

The Honorable Bruce D. Parent,
Judge

Trial Court Cause No.
45D04-1110-CT-226

**Brown, Judge.**

[1]  Buddy & Pal's III, Inc., appeals from the trial court's denial of its motion for judgment on the evidence and motion to correct error. Buddy & Pal's raises two issues which we consolidate and restate as whether the trial court erred or abused its discretion in denying its motion for judgment on the evidence or its motion to correct error. We affirm.

## Facts and Procedural History

[2]  Steven Shearer went to a bar operated by Buddy & Pal's at approximately 10:00 or 11:00 p.m. on Saturday, January 16, 2010. Richard Coyle also went to the bar with Anthony Apato and others at about 10:00 or 10:30 p.m., parked behind the building, entered the bar, and danced and had bottles of beer. Coyle left the bar a short time before 2:00 a.m., warmed up his truck for five to ten minutes, and then pulled his truck around to pick up Apato. Shearer exited Buddy & Pal's. As Coyle's truck approached the entrance and as the truck was moving at approximately three to five miles per hour, Coyle's truck struck Shearer. Coyle kept driving.

[3]  Schererville Police Officer James Janson and other officers were standing on the sidewalk in front of the building near the entrance, and Officer Janson heard a commotion and people screaming, saw others attempting to attract his attention, was told that a pick-up truck had hit a pedestrian, and was pointed to the truck. As another officer tended to Shearer, Officer Janson entered his police vehicle, caught up with Coyle's truck which had traveled twenty or twenty-five yards to the exit of the parking lot, and activated his lights. Officer

Janson exited his police vehicle, approached Coyle and asked him to exit his truck, placed Coyle in handcuffs, and had him sit in the back of the police vehicle. Officer Janson stood outside the police vehicle while he spoke to Coyle. Officer Janson noticed a very strong odor of an alcoholic beverage coming from Coyle's breath, that he was slurring and mumbling a lot, that he was spitting quite a bit while he was talking, and that his eyes were red, bloodshot, and very droopy. When Officer Janson asked him why he did not stop, he replied that he did not know and began to become irritated and use expletives. Officer Janson asked Coyle if he would submit to any field sobriety tests, a portable breath test, or a certified breath test, and Coyle replied that he would not. Officer Janson placed Coyle under arrest for driving while intoxicated and for fleeing the scene or hit and run.

[4] In late October or early November of 2011, Shearer filed an action against Buddy & Pal's and Coyle.[1] Coyle settled with Shearer in February of 2015.[2] A jury trial was held in November 2016 at which the parties presented the testimony of Shearer, Shearer's mother, Officer Janson, Timothy Heidbreder, who was the owner of Buddy & Pal's, and a manager at Buddy & Pal's. Coyle and Apato were not present at the trial, and portions of their depositions were

---

[1] The chronological case summary includes an entry on October 27, 2011, stating "Petition for Negligence – Other filed in clerks office on 10/25/11," and an entry on November 1, 2011, stating "Sum & Compl. Issued" and listing Coyle and Buddy & Pal's. Appellant's Appendix Volume II at 16-17.

[2] The trial court, in its order of jury trial, states that Shearer had asked that Buddy & Pal's be prevented from introducing evidence of his settlement with Coyle and that the court had denied the request in part, ordering that Buddy & Pal's could introduce the fact that Shearer and Coyle had settled but could not delve into any of the parameters of that settlement in the presence of the jury.

read into evidence, and a video deposition of Dr. Robert Hanlon who had examined Shearer was also presented.

[5] Timothy Heidbreder, the owner of Buddy & Pal's, testified that Saturdays were the bar's busy nights and that, over the course of the evening, there might be 175 to 190 people there at one time. He indicated that, other than charging for drinks, servers do not keep track of how much a customer is consuming. He testified: "Our rule of thumb is, we'll have ten to twelve to one. In other words, if there's a hundred and twenty people there, we want ten people on the floor, whether they're bartenders, servers, security, people at the door checking ID's." Transcript Volume II at 54. When asked "[a]nd these shot girls, they sell trays of drinks, right," Heidbreder answered affirmatively. *Id.* When asked if they have quotas to sell for the evening, he answered affirmatively, and when asked if the quotas are minimums, he answered "[n]o, not really" and "there's no minimums." *Id.* When asked if Buddy & Pal's had a policy regarding over-serving or signs of visible intoxication, Heidbreder replied affirmatively, and when asked how that was conveyed to servers and bartenders, he testified that it was given to them in written form to read and that the manager reviewed it with them line-by-line. He also testified that there were periodic training sessions or discussions by managers. The trial court admitted Buddy & Pal's employee policy manual, which stated that certain documents were required to be given or returned to the manager prior to the start of employment, including Buddy & Pal's Inc.'s Liquor/Beer Pouring Policy and Responsible Alcohol

Service Acknowledgement form, and that certain types of conduct would result in immediate termination, including violations of its pouring policy.

[6] In the portions of his deposition read into evidence, Coyle testified that, prior to arriving at Buddy & Pal's, he and Apato were at a friend's house and that he did not have anything to drink while there. He testified that he drove his truck, and Apato rode with him, to Buddy & Pal's and arrived "closer to ten." *Id.* at 153. Coyle testified he had "about two beers" of Miller Lite, that he did not have any shots, that the beer was in bottles, and that he paid using cash. *Id.* at 154. When asked "[w]as it out of like the beer tubs or was it from the bar," Coyle answered "[f]rom the bar," and when asked if he purchased them or if someone else bought them for him, he answered "I purchased them." *Id.* Coyle indicated he felt "fine" when he purchased and paid for his last beverage, that he felt "fine" when he left Buddy & Pal's, and that he was not intoxicated after he left. *Id.* at 147, 155. When asked "[w]hen you got into your . . . truck, did you feel the same as you did when you purchased the last beverage," Coyle answered "I felt sober," and when asked "[w]ould it be the same condition," he replied "[b]etter." *Id*. at 147. He indicated that he felt "better" at the time he entered and began to drive his truck than when he purchased his last beverage. *Id.* Coyle testified "I heard people screaming like whoa, whoa, whoa, and that's when I pulled up and by the time I got it in park, a cop got me" and "I had pulled right up and as I put it in park he was already there" and "[h]e pulled right there and he yanked me out of the truck." *Id.* at 156-157.

[7] Officer Janson testified that he had been a police officer for thirteen and one-half years and his duties included driving while intoxicated and alcohol related offenses, and he described signs of alcohol impairment. He testified that Buddy & Pal's closed at 2:00 a.m. and officers were present in the parking lot to make sure there were no problems. Officer Janson testified that, after he was pointed to the truck, he went after and caught up to Coyle, that "[i]t's not a huge parking lot but he probably made it maybe twenty, twenty-five yards and then he got to the exit where you edge the parking lot onto Route 30," that "because everybody was leaving the bar the entrance and exit there was all just bottlenecked up with cars leaving and that's as far as he could go," and that "[h]e couldn't go any further than that" and "[h]e got stuck in that traffic." Transcript Volume II at 94. Officer Janson testified that he detected "a very strong odor" of an alcoholic type beverage coming off of Coyle's breath, Coyle was slurring and mumbling a lot, he was spitting quite a bit while he was talking,[3] and his eyes were red, bloodshot, and very droopy. Officer Janson testified that, when he told Coyle that he thought he had hit a pedestrian in the parking lot, Coyle said "I know I did and then he began to cry." *Id.* at 95. He testified that he asked Coyle why he did not stop if he knew that he struck somebody and that Coyle responded "I don't know" and started to become a little irritated and use expletives. *Id.* He testified that, based on his education, training, and experience, the signs he observed of Coyle matched those he was

---

[3] Officer Janson testified "this must have been significant because I don't usually document this in my report but he was spitting quite a bit while he was talking." Transcript Volume II at 94.

taught to observe with regard to alcohol impairment. Officer Janson indicated that he arrested Coyle for operating while intoxicated and for fleeing the scene or hit and run. The probable cause affidavit indicated that Coyle struck a pedestrian with his vehicle in the Buddy & Pal's parking lot, the accident involved a personal injury, and Coyle left the scene of the accident and operated a vehicle while intoxicated. On cross-examination, Officer Janson agreed that, according to Coyle's plea agreement, Coyle pled guilty to the charge of failure to stop and the charge, as amended from operating while intoxicated, to reckless driving.

[8] In the video deposition of Dr. Hanlon played for the jury, Dr. Hanlon testified that he was a clinical neuropsychologist and that he performed an evaluation of Shearer on October 9, 2013, which included a review of his medical records, an interview of Shearer's mother, and an interview and series of tests of Shearer. Dr. Hanlon testified that, following his evaluation, he diagnosed Shearer as having somatic symptom disorder and testified that the stress Shearer experienced following the accident was the triggering element that resulted in his disorder. Dr. Hanlon testified that he did not doubt that Shearer experienced physical pain and symptoms at the time of the accident and afterwards but that "over time . . . that then just morphed into as he physically recovered from it, it converted from the true physical symptoms into psychologically based complaints" and stated that some persons with the disorder do not believe they have a psychiatric condition, they strongly believe that they have a physical disorder, and "[t]hey generally will resist attempts by

doctors, psychologists, psychiatrists, neurologists, etcetera to convince them that their condition is actually a psychiatric one and not a physical one." *Id.* at 172. On cross-examination, Dr. Hanlon indicated that Shearer's cognitive functions are all intact, that he performed consistently within normal limits with respect to all cognitive intellectual functions, and there was no evidence of brain injury.

[9] Shearer testified on cross-examination that he was not sure what Dr. Hanlon diagnosed him with and that he was not familiar with Dr. Hanlon's diagnosis. Shearer indicated that he did not know whether Dr. Hanlon had said that he had somatic symptom disorder. Shearer indicated that Dr. Hanlon did not communicate to him that the pain he said he was experiencing was generated by his mind or psyche, and when asked if anyone had told him that, he answered "like some relatives or they might say like they think it's all in my head" and that he "would explain to them that it's – it's to my back. I know this – You know, it's my back and my neck and my head." *Id.* at 220-221. Shearer indicated that he did not believe that his injuries were all in his head. Counsel for Buddy & Pal's asked Shearer "[a]re you asking the jury to award you money for an injury - this Somatic Symptom Disorder," and Shearer replied "[n]o sir, I am not." *Id.* at 221. When asked "[a]re you asking for the physical injuries you're . . . claiming," he stated "[u]m, I'm not sure that I'm asking for that," and when asked "[f]or the physical injury," he said "[y]eah, not particularly, just that, you know, itself." *Id.* When asked "[b]ut, you're sure you're not asking for the Somatic Symptom Disorder," he answered

"[y]eah, I'm not - I'm not asking for that." *Id*. On redirect examination, Shearer's counsel asked Shearer if he was asking the jury to hold Buddy & Pal's accountable for what it did to him, Shearer responded affirmatively, and when asked if he was asking the jury "to take into consideration the impact your injuries have had on your life," Shearer replied "[y]es. Yes, I am." *Id*. at 223.

[10] After Shearer rested, Buddy & Pal's filed a motion for judgment on the evidence arguing that no evidence was offered which raises a jury issue on the allegations of negligence contained in Shearer's complaint, that Shearer testified that he is not pursuing a claim for a mental health injury, and that the question of whether Buddy & Pal's conduct was the cause of a mental health injury sustained by Shearer should not be submitted to the jury. Counsel for Buddy & Pal's argued that Officer Janson was not inside Buddy & Pal's and that Shearer did not present evidence that Coyle was visibly intoxicated while inside or that Buddy & Pal's had any knowledge that he was visibly intoxicated. Counsel for Buddy & Pal's further argued that Shearer was fully capable of making decisions for himself and "deciding for himself what claims he's going to pursue and what claims he's not going to pursue," and that Shearer indicated on cross-examination that he was not asking the jury to award damages for his somatic symptom disorder. Transcript Volume III at 31. In response, Shearer's counsel argued that Shearer testified he is seeking money damages for the pain and the limitations which he is experiencing, that Dr. Hanlon testified as to what is causing that, and that Shearer met the necessary elements to pursue a claim of damages based upon his pain limitations which are caused by his disorder.

Shearer's counsel also argued that the jury heard Officer Janson's testimony and Coyle's statement that the crash occurred five or ten minutes after he left the bar. The trial court denied Buddy & Pal's motion.

[11] In the portions of his deposition read into evidence, Apato testified that he did not observe Coyle drinking prior to going to Buddy & Pal's. Apato stated that he and Coyle arrived at Buddy & Pal's at around 10:30 p.m., that they met other friends there, and that he and Coyle were not together the entire time. Apato testified, when asked how much Coyle had to drink, "I'm not 100 percent" and "I've seen him drink like a beer." *Id.* at 60. Apato testified Coyle "seemed fine" before he left the bar. *Id.* at 62. When asked to describe the accident, Apato testified that Coyle "like went down to his middle console like he dropped something" and "went to pick it up and then this kid was coming this way, but he was looking the opposite way and not paying attention to the truck." *Id*. at 63. Apato also stated that Shearer looked like he had been drinking a lot.

[12] The jury determined that Shearer was seventeen percent at fault, Buddy & Pal's was twenty-one percent at fault, and Coyle was sixty-two percent at fault, awarded total damages of $155,000, and awarded damages against Buddy & Pal's in the amount of $32,550. On November 16, 2016, the trial court entered judgment consistent with the jury verdict. Buddy & Pal's filed a motion to correct error arguing that the court erred in denying its motion for judgment on the evidence and that the jury verdict was excessive. In its order denying the motion to correct error, the court noted that the probable cause affidavit in

connection with Coyle's arrest described the arresting officer's observations; observed that Shearer does not have the background, education, or the necessary level of mental health to know what condition he had been diagnosed with, much less to testify related to the condition, his understanding of it, and as to whether or not he agreed with Dr. Hanlon's diagnosis; stated there was testimony that, due to the circumstances of his unique mental health, Shearer was unable to advocate for himself on this issue and thus the court did not preclude his attorney advocating this position on his behalf; and observed that Shearer correctly argued he sought recovery from Buddy & Pal's for injuries beyond somatic stress disorder and that the jury did not break out damages based upon each individual injury that it believed was suffered by Shearer.

## Discussion

[13] The issue is whether the trial court erred or abused its discretion in denying Buddy & Pal's motion for judgment on the evidence or its motion to correct error. Ind. Trial Rule 50 provides that a motion for judgment on the evidence shall be granted "[w]here all or some of the issues in a case . . . are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it . . . ." Ind. Trial Rule 50(A). "A motion for judgment on the evidence should be granted only when there is a complete failure of proof because there is no substantial evidence or reasonable inference supporting an essential element of the claim." *Belork v. Latimer*, 54 N.E.3d 388, 394 (Ind. Ct. App. 2016) (citations and internal quotation marks omitted). Upon appellate review of a trial court's

ruling on such a motion, the reviewing court must consider only the evidence and reasonable inferences most favorable to the nonmoving party. *Id.* at 394-395. Also, we review rulings on motions to correct error for an abuse of discretion. *Speedway SuperAmerica, LLC v. Holmes*, 885 N.E.2d 1265, 1270 (Ind. 2008), *reh'g denied*.

[14] Buddy & Pal's argues that no evidence was presented to show that it had actual knowledge of Coyle's intoxication at the time of serving him. It argues that, while the evidence shows Coyle was at Buddy & Pal's for approximately three and one-half to four hours, it did not show when Coyle purchased his alcoholic beverages. It contends that Officer Janson's observations could have been hours after Coyle was last served alcohol. Also, Buddy & Pal's states that it does not dispute that Shearer has somatic symptom disorder but asserts that Shearer, with full cognitive function and ability, decided not to pursue the injury advanced by his counsel.

[15] Shearer maintains that proof of actual knowledge may be made by circumstantial evidence, that Coyle consumed alcohol only at Buddy & Pal's, and that Officer Janson observed Coyle immediately after the accident. He argues that the jury was presented with conflicting statements from Coyle and Officer Janson, that the jury was not required to take Coyle at his word regarding how much he had to drink, and that it was reasonable based on Officer Janson's testimony to conclude that Coyle was exhibiting signs of visible intoxication at the time he purchased his last alcoholic beverage. He argues that Coyle purchased each of his alcoholic beverages from a bartender

and that no one else purchased drinks for him. Shearer also maintains that, regardless of his normal cognitive functions, he is not a qualified medical expert and is in no way qualified to determine his own injuries; that while he claimed he was seeking recovery for his shoulder injury rather than his mental disorder, "the two are one in the same"; and that he sought recovery for injuries in addition to the mental disorder. Appellee's Brief at 25.

[16] Indiana's Dram Shop Act "represents a legislative judgment that providers of alcoholic beverages should be liable for the reasonably foreseeable consequences of knowingly serving alcohol to visibly intoxicated persons." *BGC Entm't, Inc. v. Buchanan ex rel. Buchanan*, 41 N.E.3d 692, 697 (Ind. Ct. App. 2015), *trans. denied*. At the time of the accident, Ind. Code § 7.1-5-10-15(a) provided: "It is unlawful for a person to sell, barter, deliver, or give away an alcoholic beverage to another person who is in a state of intoxication if the person knows that the other person is intoxicated." (Subsequently amended by Pub. L. No. 159-2014, § 80 (eff. Jul. 1, 2014)). Further, Ind. Code § 7.1-5-10-15.5 provided in part that, in order to be held civilly liable, the person furnishing the alcoholic beverage must have "had actual knowledge that the person to whom the alcoholic beverage was furnished was visibly intoxicated at the time the alcoholic beverage was furnished."

[17] The furnisher's knowledge must be judged by a subjective standard. *Delta Tau Delta, Beta Alpha Chapter v. Johnson*, 712 N.E.2d 968, 974 (Ind. 1999) (citing *Gariup Constr. Co. v. Foster*, 519 N.E.2d 1224, 1229 (Ind. 1988)), *abrogated on other grounds*. Absent an admission that the person furnishing alcohol had

actual knowledge of the other's intoxication, the trier of fact must look to reasonable inferences based upon an examination of the surrounding circumstances. *Id.* (citing *Foster*, 519 N.E.2d at 1230; *Booker, Inc. v. Morrill*, 639 N.E.2d 358, 362 (Ind. Ct. App. 1994)). Actual knowledge of intoxication can be inferred from indirect or circumstantial evidence such as "what and how much the person was known to have consumed, the time involved, the person's behavior at the time, and the person's condition shortly after leaving." *Id.* (quoting *Booker*, 639 N.E.2d at 362).

[18] The evidence most favorable to the nonmoving party reveals that Coyle had not had any alcoholic beverages prior to going to Buddy & Pal's, arrived at Buddy & Pal's at approximately 10:00 or 10:30 p.m., purchased beer from the bartender at the bar, did not have any shots, exited the bar shortly before 2:00 a.m., warmed up his truck for five to ten minutes, and then pulled around to pick up Apato and struck Shearer. Officer Janson stopped Coyle as he drove toward the exit of the parking lot. Officer Janson testified that he detected a very strong odor of an alcoholic beverage coming from Coyle's breath and observed that Coyle's eyes were red, bloodshot, and very droopy, that Coyle was slurring and mumbling a lot, and that Coyle was spitting quite a bit while talking, which Officer Janson testified he believed must have been significant because he documented it. As Officer Janson questioned Coyle, he became irritated and began to use expletives. Officer Janson testified that, based on his education, training, and experience, the signs he observed of Coyle matched those he was taught to observe with regard to alcohol impairment and that he

arrested Coyle for operating while intoxicated. Further, the probable cause affidavit prepared by Officer Janson indicated that the odor of intoxicant was strong, Coyle's eyes were watery and bloodshot, his face was flushed, his reaction was dull, his manual dexterity was slow and clumsy, and his balance was unsteady. Proof that Buddy & Pal's knew of Coyle's intoxication may be made by indirect or circumstantial evidence including evidence of Coyle's condition shortly after leaving the bar. The evidence demonstrates that the accident occurred five to ten minutes after leaving the bar and establishes the extent to which Coyle appeared visibly intoxicated at that point. The trier of fact was free to disbelieve the testimony of Coyle regarding his alcohol consumption and to reasonably infer, based on the behavior Coyle exhibited a short time after leaving the bar, that Coyle must have exhibited visible signs of intoxication at the time he purchased his last alcoholic beverage.

[19] Based on the record, we cannot conclude that there was a complete failure of proof or reasonable inference supporting Shearer's claim. *See Marlow v. Better Bars, Inc.*, 45 N.E.3d 1266, 1274 (Ind. Ct. App. 2015) (noting in part the bar's customer had consumed at least one alcoholic beverage at the bar and thereafter an officer observed numerous signs of impairment including slurred speech, watery and bloodshot eyes, and unsteady balance and holding that the trier of fact could reasonably infer that the customer was visibly intoxicated when the bar served him alcohol and that the bar did so with actual knowledge of his intoxication), *trans. denied*; *Vanderhoek v. Willy*, 728 N.E.2d 213, 217 (Ind. Ct. App. 2000) (observing the customer was served at least three beers and ordered

at least one of the beers from the bar area, the customer testified he had not consumed alcohol prior to his arrival at the bar, and a short time after leaving he failed several field sobriety tests and holding the trier of fact could reasonably infer that the bar had actual knowledge of the customer's intoxication at the time he was served).

[20] As for Shearer's claimed injuries, Shearer indicated during cross-examination that he was not asking the jury to award him money for his somatic symptom disorder. However, Shearer also indicated that he was seeking damages for his physical injuries and that he had explained to his relatives that he had injuries to his back, neck, and head. Shearer presented the video deposition testimony of Dr. Hanlon, Buddy & Pal's does not point to the record to show it objected to Dr. Hanlon's testimony, and Dr. Hanlon testified that he diagnosed Shearer with somatic symptom disorder and that the stress Shearer experienced following the accident was the triggering element that resulted in his disorder. Dr. Hanlon testified that some persons with the disorder do not believe they have a psychiatric condition and strongly believe they have a physical disorder. Shearer also indicated that he was not exactly sure what Dr. Hanlon diagnosed him with, was not familiar with Dr. Hanlon's diagnosis, and did not know whether Dr. Hanlon had said he had somatic symptom disorder, and he indicated that Dr. Hanlon did not at any point communicate to him that the pain he was experiencing was generated by his psyche. Further, Shearer indicated that he was asking the jury to hold Buddy & Pal's accountable for what it did to him. Shearer testified that he was given pain medicine and anti-

inflammatories, he received a sling for his arm to take the pressure off of his back which he wore for months, he visited a neurologist, he completed physical therapy, heat and biofreeze was applied, he had an allergic reaction to the medicine, and he received injections to the damaged area and into the top of his spine. In closing, Shearer's counsel argued that, for two and one-half years, Shearer obtained treatment, with various doctors for his pain including x-rays, MRIs, physical therapy, pain medications, and epidural injections in his neck, that none of the treatment helped, and that Dr. Hanlon determined that Shearer suffered a permanent debilitating mental handicap and that the prognosis is poor. Shearer's medical records were admitted into evidence. The jury determined that Shearer's total damages were $155,000 and did not specify the portion of the award attributable to his somatic stress disorder. Shearer claimed damages for injuries he suffered as a result of the accident and presented evidence supporting his claims, and we decline to disturb the trial court's ruling.

## *Conclusion*

[21] For the foregoing reasons, we affirm the trial court's denial of Buddy & Pal's motion for judgment on the evidence and motion to correct error.

[22] Affirmed.

Najam, J., and Kirsch, J., concur.